UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

DOCKET NO. 21-20357-cr-MOORE

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

LONTRELL WILLIAMS, JR.,

    Defendant,
_____/

**DEFENDANT LONTRELL WILLIAMS, JR.'S
OBJECTIONS TO THE OFFENSE CONDUCT AND OFFENSE LEVEL
COMPUTATION SECTIONS OF THE PRESENTENCE INVESTIGATION REPORT**

    The defendant, Lontrell Williams, Jr., by and through his undersigned counsel, and pursuant to U.S.S.G. § 6A1.2-3, p.s., Fed. R. Crim. P. 32 (d), (e)(2) and (f), and the Fifth Amendment to the United States Constitution, respectfully registers his Objections to the Offense Conduct and Offense Level Computation Sections of the Presentence Investigation Report ("PSR") and states as follows:

### I. INTRODUCTION:

    The Offense Conduct section of the PSR is presented in paragraphs 14 through 50 of the PSR. The Offense Level Computation begins at paragraph 63 and ends at paragraph 86, recommending a total offense level 29. Mr. Williams' objections, through counsel, specifically relate to the suggestion the October 9, 2020, Bay Harbor incident involved a "Robbery/Shooting" (beginning at paragraph 64) and, as such, the cross-reference at § 2K2.1(c)(1)(A) applies. Further, we will provide both ballistics and forensic evidence that Mr. Williams did not fire a weapon and

1

did not strike anyone during the Bay Harbor incident. Finally, in the alternative, we believe that sentencing enhancements from the Robbery guideline, § 2B3.1, were not applied correctly

## II. OBJECTIONS TO THE PSR:

**1.     This Was Not A Robbery In Which Mr. Williams Was Involved, And The Cross-Reference In § 2K2.1(C)(1)(A) Does Not Apply.**

Consistent with the evidence in this case, or lack thereof, there was never a conspiracy to commit a robbery. Mr. Williams' involvement in this matter, on October 9, 2020, was nothing more than a drug deal for personal use. This is evidenced through the text messages provided by the Government. Any assertion that he had any involvement in or planned a robbery is pure speculation. There is not a preponderance of evidence he knew of a robbery, planned a robbery, or took any action in furtherance of a robbery. As such, the cross reference at § 2K2.1(c)(1)(A) and the resulting enhancements in § 2B3.1 (see paragraphs 65 through 68) do not apply in this case. The correct guideline calculations for the Bay Harbor incident are confined to § 2K2.1, the same section used to compute the May 30, 2021, King of Diamonds shooting.

Publication 107, published by the Administrative Office of the United States Courts, March 2006, instructs federal probation officers as to the content and format of presentence investigation reports submitted to the district courts. Pursuant to III-10,

> "The offense conduct is a concise but complete description of the defendant's conduct and the conduct of co-defendants or other participants. It addresses all relevant conduct occurring during the offense of conviction, including the planning and preparation for the offense, and the circumstances leading to the arrest or summons of the defendant.

> **"Any factual details of the offense behavior that support the determination of a base offense level, specific offense characteristic, cross reference, victim adjustment, role adjustment, obstruction of justice, or adjustment for acceptance of responsibility are included."**

Mr. Williams, through counsel, asserts the Offense Conduct section in the PSR is not complete, nor does it include factual details that support the determination of the guideline calculations; specifically, the cross reference suggested in the PSR. For instance:

- Mr. Williams has accepted responsibility for conspiring to use or carry firearms during, and in relation to, drug trafficking and violence. Consistent with the written Plea Agreement and the agreed facts contained in the Factual Proffer, Mr. Williams has not pled guilty to robbery. Specifically, as stated in paragraph five of the Factual Proffer, Mr. Williams has not pled guilty to robbery as to the Bay Harbor incident, Mr. Williams and his associates arrived at the meeting to acquire marijuana, codeine, and sneakers.

- Mr. Williams and J.S. made arrangements to meet on October 9, 2020, so Mr. Williams could arrange to extend the rental of the McLaren automobile J.S. provided him four or five days earlier.[1] Admittedly, Mr. Williams and J.S. also met for the purpose of conducting a drug transaction. Mr. Williams had bought drugs from J.S. on at least five (5) previous occasions with no issues whatsoever. (See J.S. police statement). J.S. is a drug dealer, with pending federal criminal charges. (See Case Number 21-CR-20534)**.**

---

[1] A 2022 McLaren automobile retails from approximately $215,000 to $382,500. www.supercars.net

- Texts support the McLaren rental. They also support a drug transaction, but not a robbery, set for October 9, 2020. There are no texts, calls, emails, or other evidence supporting the planning of a robbery, before or after the events. Texts further support Mr. Williams met J.S. to buy $600 worth of liquid codeine and marijuana. Once at the location, B.C. attempted to "sell" a pair of high-end athletic sneakers to ascertain how much money Mr. Williams had in his possession. Evidence in this case is that Mr. Williams arrived at the arranged Bay Harbor meeting site with $40,912 in U.S. currency, which he commonly carries. Mr. Williams' Louis Vuitton bag containing the currency and computer with original music was recovered by law enforcement. **With that said, the Government wants this Court to believe Mr. Williams, with a net worth of $3,449,446, planned a robbery, then committed a robbery, and then shot a known drug dealer who knew him well and could easily identify him. All over a few hundred-dollar drug deal for personal use, while he was driving a lime green McLaren (that he rented from the alleged victim J.S.) and had $40,912 in his possession at the time.[2]**

- There is no evidence of Mr. Williams involvement in a robbery. There is no audio or even texts discussing a robbery. No drugs or weapons were seized or recovered by law enforcement from Bay Harbor. There are no cooperators in this case. There are no statements of co-defendants. A review of the Detention Hearing transcript confirms this, as well as the statements of Judge Torres regarding the lack of evidence of participation in a robbery by Mr. Williams.

Mr. Williams, through counsel, recommends the following corrections to the guideline calculations presented in the PSR:

---

[2] PSR, ¶ 124

- ¶ 64; Count One is a violation of 18 USC § 924(o) and is found in § 2K2.1 of the Guidelines Manual.  The base offense level is 18, § 2K2.1(a)(5), because the offense involved a firearm described in 26 USC § 5845(a).

- ¶ 65 through ¶ 67 are deleted because Mr. Williams was not involved in a robbery.

- ¶ 68 should be amended to include only a 4-level enhancement, § 2K2.1(b)(6)(B), because a firearm was possessed or used in connection with another felony offense, that being a drug transaction.

- ¶ 72 should indicate an adjusted offense level 22.

- ¶ 79 should indicate an adjusted offense level 22, the King of Diamonds receives one unit, and the total units is 2.

- ¶ 80; the greater adjusted offense level above is 22.

- ¶ 81; there is a two-level increase, § 3D1.4.

- ¶ 82; the combined adjusted offense level is 24.

- ¶ 86; the total offense level is 21, after a reduction for Mr. Williams' complete and timely acceptance of responsibility.

- ¶ 142; based upon a total offense level 21 and a criminal history category I, the guideline imprisonment range is **37 to 46 months**.

2.   **Mr. Williams Never Discharged A Weapon And Is Not Responsible For Anyone Being Shot.**

The evidence provided by the Government coupled with the investigation from the defense clearly establish that it would have been impossible for Mr. Williams to have fired a weapon from the position he was in that would have resulted in striking B.C. in the buttocks.  Although there

5

was a lack of a complete medical records provided on B.C.'s injuries, the medical records that were provided establish a wound that entered the left buttocks near the top of the muscle and exited at the lower part of the muscle. The angle being that of a downward slope. Mr. Williams was sitting in a prone position. When B.C. got shot, he was standing in front of the passenger door at an angle above Mr. Williams. It simply would have been impossible for the wound to occur with Mr. Williams being the shooter. Further, although during the bond hearing and presumably before the Grand Jury, the Detective presented evidence that there was a "bullet hole" found in the Maybach Mercedes parked next to Mr. Williams' vehicle. However, the FBI's forensic analysis on the hole conclusively stated that the damage to the Maybach did not occur from a gunshot. Finally, the Government had an opportunity to conduct a GSR on Mr. Williams' vehicle to confirm he fired a weapon within but decided not to. This is significant as there were no shell casings found in Mr. Williams' car. Looking at the video evidence it demonstrates that an unnamed, unknown individual raises an AR-type weapon in the exact angle that would cause the same wound to B.C. at the exact time he jumps and grabs his buttocks. The totality of the circumstances show that Mr. Williams was not the individual who shot B.C. and, in fact, confirms that he never fired a weapon that day.

    **3.**     **<u>Section 2B3.1 Enhancements Do Not Apply</u>.**

Specifically, we object to paragraph 66, which provides a 7-level enhancement because a firearm was discharged, and paragraph 67, which provides another 4-level enhancement because a victim sustained a serious bodily injury. These objections are made, notwithstanding our first objection that this was not a robbery, the cross reference does not apply and, therefore, § 2B3.1 does not apply in its entirety.

¶¶ 67 and 68, as already stated in objection 2, Mr. Williams did not discharge a weapon

and he did not shoot anyone or cause anyone to sustain any injury. It follows then that the relevant conduct provisions of § 1B1.3(a)(1)(A) do not apply. However, to apply these enhancements in § 2B3.1, there must be a finding that Mr. Williams is responsible for the relevant conduct of others present at Bay Harbor; that is, the discharge of their weapons and the injuries that resulted from the firing of their weapons. To do this, the Court must find both enhancements, pursuant to § 1B1.3(a)(1)(b)(I), were within the scope of the jointly undertaken criminal activity, (ii), in furtherance of that criminal activity, and (iii), reasonably foreseeable in connection with the criminal activity.

4.     **Mr. Williams' Objections To Specific Factual Portions Of The PSR.**

The following objections to specific paragraphs in the PSR further support the position there was no robbery:

- ¶ 16 must be restated to clarify the date and weapons that are alleged to have been possessed by Mr. Williams. The first is a Glock .22 pistol on December 12, 2019, *see* ¶ 20, and the second is a 7.62 semi-automatic pistol on October 20, 2020.

- ¶ 17 is not an accurate factual statement as evidenced by the text messages provided by the Government as any discussions regarding purchasing marijuana were for personal use, not distribution.

- ¶ 18; "Choppa Gang" is a music label created and established by Mr. Williams to normalize himself in the music industry as is a music norm. It has a clothing label, merchandise deals, production deals, investment deals, and is a registered corporation.

- ¶ 21 is not an accurate factual statement as counsel for Mr. Williams travelled to Arkansas and obtained an original copy of the police report for the incident referenced in this

paragraph. The report clearly states that after a musical performance multiple vehicles went to the incident location which was the residence of one of the females that attended the concert. Thereafter, according to witnesses, a dispute occurred after an unknown male stole a vehicle from the location. Mr. Williams had nothing to do with the auto theft or the shooting that occurred. Notably, this incident occurred over two (2) years ago and Mr. Williams was never arrested nor charged with any crimes resulting from the March 15, 2020, incident.

- ¶ 22 should be deleted as the incident described relates in no way to Mr. Williams and there is no evidence to link Mr. Williams to this incident. Rather, it reads as an attempt to unfairly demonize Mr. Williams. In fact, it does not even include Mr. Williams' name in any way, shape, or form so as to connect him with these actions.

- ¶ 23 is not an accurate factual statement as Mr. Williams was not in the vehicle when it returned to the scene, nor is there evidence to suggest he was in the vehicle when it returned to the scene.

- ¶ 27; Mr. Williams did not shoot B.C. The video clearly shows another individual raising his firearm as B.C exits the vehicle. As that firearm is raised is when B.C. jumps and grabs his buttocks. The only time that Mr. Williams brandished his weapon was when J.S. was reaching for a firearm directly in Mr. Williams' line of sight. At this point, Mr. Williams opened his vehicle door and cautioned J.S., "[d]on't try it." Mr. Williams did not shoot J.S. or discharge his firearm at him.

- ¶¶ 30-31 do not accurately portray the statements of B.C. or J.S. or how they changed their testimony. What did not change, however, was that both B.C. and J.S. were shocked by this incident as J.S. said that they had multiple drug transactions (personal use purchases by

8

Mr. Williams) and that they all went without incident. B.C. originally denied there was a drug deal and attempted to say it was a sneaker deal from the beginning.

- ¶ 32; Mr. Williams never brandished a weapon while B.C. was in the McLaren. As discussed, Mr. Williams possessed over $40,000 in cash and was driving a vehicle valued at over $200,000. It would be illogical for Mr. Williams to stage a robbery by two other individuals over something so miniscule as a bottle of liquid codeine with a retail value of a few hundred dollars, at most, when any damage done to the McLaren in the process would have cost thousands of dollars to repair. Candidly, if Mr. Williams had an assault rifle and the ability and intent to rob B.C., he could have easily done so by himself. The video surveillance confirms that the duffle bag with the bottle of liquid codeine was taken to another vehicle by other individuals and that Mr. Williams did not possess the stolen items or attempt to possess them. This is because Mr. Williams was unaware of a robbery. Had Mr. Williams concocted this plan, the duffle bag would have remained in his McLaren, or he would have ensured that any material involved in this incident, including his firearm, were removed by the other individuals along with the duffle bag.

- ¶ 34; B.C. was not wearing any jewelry. Further, this paragraph should include that B.C. is currently under indictment for a crime of moral turpitude and the purported value of the items is incorrect. It is clear from the video that B.C. had no jewelry on, no necklace, no bracelet, and no watch. Even the police were so skeptical about this assertion they did not include it in the original charge.

- ¶ 39 should be amended to clarify that Judge Mindy Glazer issued a $30,000 bond for Mr. Williams at first appearance on a non-bondable charge, thus demonstrating the strength, or lack thereof, of the Government's allegations of an armed robbery.

- ¶ 40; *See* the Fifth Amendment to the United States Constitution. There should be no negative inference by exercising the right to remain silent.

- ¶ 41 should be amended to clarify that both B.C. and J.S. immediately filed lawsuits against only Mr. Williams demanding millions of dollars in unsubstantiated damages and, despite being shot by Bobby Brown, J.S. has not sued Bobby Brown, only Mr. Williams in an attempted cash-grab.

### 5. **Conclusion.**

Everything submitted in this filing clearly supports a finding that the cross-over in § 2K2.1(c)(1)(A) does not apply, the robbery guideline in § 2B3.1 and its enhancement do not apply, and that the correct guideline section to be used in the Bay Harbor incident is § 2K2.1.

### III. SENTENCING FACTORS PURSUANT TO 18 USC § 3553:

A separate filing will address factors that will support a Below-Guideline sentence in this case. Additionally, any corrections/clarifications to non-sentencing issues in the PSR have been communicated directly with the probation officer.

[CERTIFICATE OF SERVICE ON THE FOLLOWING PAGE]

## CERTIFICATE OF SERVICE

THE UNDERSIGNED HEREBY CERTIFIES that the foregoing document was electronically filed with the Clerk of the Court using CM/ECF and that a true and correct copy of this document has been served on all persons on the following Service List on March 11, 2022, either electronically in compliance with the Notice of Electronic Filing generated by CM/ECF or in some alternative manner for those parties who may not be permitted to receive electronic filings via CM/ECF.

          **COHEN & MCMULLEN, P.A.**
          *Counsel for Defendant*
          1132 SE 3rd Avenue
          Fort Lauderdale, Florida 33316
          Telephone: (954) 523-7774
          Facsimile: (954) 523-2656
          Email: service@floridajusticefirm.com

          By: /S/ Bradford M. Cohen, Esq.
                BRADFORD M. COHEN, ESQ.
                Florida Bar Number: 118176

**SERVICE LIST**

UNITED STATES OF AMERICA v. LONTRELL D. WILLIAMS
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA CASE NO.: 21-CR-20357-KMM-1

**Saam Zangeneh, Esq.**
**Saam Zangeneh, P.A.**
14 N.E. 1st Avenue, Suite #300
Miami, FL 33132
Telephone: (305) 441-2333
E-mail: saam@zangenehlaw.com
*Counsel for Defendant*

**Arielle Klepach, A.U.S.A.**
United States Attorney's Office
Southern District of Florida
99 Northeast 4th Street
Miami, FL 33132
Office Tel: (305) 961-9001
E-mail: arielle.klepach@usdoj.gov

**Dayron Silverio, A.U.S.A.**
Department of Justice/United States Attorney's Office
99 Northeast 4th Street
Miami, FL 33132
Office Tel: (305) 961-9009
E-mail: dayron.silverio@usdoj.gov

**Ignacio J. Vázquez, Jr., A.U.S.A.**
United States Attorney's Office
Miami Special Prosecutions Office
99 Northeast 4th Street, Room 806
Miami, FL 33132
Office Tel: (305) 961-9318
E-mail: ignacio.vazquez@usdoj.gov

**William T. Zloch, A.U.S.A.**
United States Attorney's Office
500 S. Australian Ave., Suite 400
West Palm Beach, FL 33401
Office Tel: (561) 820-8711
E-mail: William.zloch@usdoj.gov